993 A.2d 535 (2010)
In re D.M., Appellant.
No. 07-FS-525.
District of Columbia Court of Appeals.
Argued March 25, 2009.
Decided April 15, 2010.
*537 Enid Hinkes, appointed by the court, for appellant.
Sidney R. Bixler, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for the District of Columbia.
Before REID and GLICKMAN, Associate Judges, and FARRELL, Senior Judge.
GLICKMAN, Associate Judge:
Appellant D.M. and his friend J.R., two juveniles, were charged jointly with arson[1] and felony destruction of property.[2] They were slated to be tried together. The morning of the hearing, though, the government dropped the charges against J.R. in exchange for his testimony against appellant. Not having any other reason to detain J.R., the trial judge held a brief hearing to review his status and to release him from pretrial custody. The judge then proceeded with appellant's delinquency trial, in which J.R. was the key witness against him, and found him involved in the charged offenses. Appellant's primary claim on appeal is that, by considering and discussing J.R.'s situation, the judge violated ethical canons that prohibit ex parte communications and require recusal when there exists an appearance of partiality on the judge's part. We disagree, and as we find appellant's other claims of error to be meritless, we affirm his delinquency adjudication.

I.
At around noon on April 23, 2007, a fire broke out on in an unused classroom on the third floor of the Taft Diagnostic Center. The school had to be evacuated. The fire did not cause extensive damage, but it destroyed a metal file cabinet and a plastic storage cabinet and blistered and stained the paint on a nearby wall. The fire inspector, Milton Olinger, estimated the total damage at "about $3,000."[3] Olinger opined that the fire was set intentionally with an open flame in the metal filing cabinet. Fire investigators found a cigarette lighter in the cabinet.
*538 After the building was secured, the Taft Center's principal, Gregory Matthews, reviewed videotape taken by a motion-activated camera monitoring the third-floor hallway. The video showed J.R. and appellant in the hallway, "engaged in conversation and maybe smoking cigarettes." According to the video, appellant entered and exited the classroom while J.R. remained in the hallway. The two young men left together. The next frames captured by the camera showed firemen arriving to put out the fire; the camera did not detect anyone else in the hallway or entering or leaving the classroom in the interim. Matthews was "100 percent sure" that the two young men in the video were J.R. and appellant. They were charged with arson and malicious destruction of property.
On the morning of trial, however, the government announced that it was dismissing the charges against J.R. Simultaneously, it subpoenaed him to testify against appellant. Because the arson case was the only charge on which J.R. was being held in custody, and because he was already under the court's probationary supervision, the trial judge decided to address his release and review his status before starting the trial. In accordance with the general rule that juvenile proceedings are to be kept confidential,[4] the judge asked, "Is it possible for [appellant] to just go into the back for a minute? Would that be okay?" Appellant's counsel responded, "Yes." The judge also asked "if the family members connected with [appellant's] matter can just wait outside for just a minute." Appellant's counsel was not asked to leave, but she did so.
Once the courtroom was partially cleared, the judge observed that J.R. had a probation review scheduled in approximately two months. Mentioning that she had received a report from J.R.'s probation officer that raised concerns regarding his mother, the judge asked the Child and Family Services social worker present whether there had been "any progress" with regard to J.R.'s placement. The social worker responded that several family members wanted to help his mother ensure that J.R. always had adequate supervision. A representative from Youth Villages chimed in that she had spoken "with the principal at the school ... [and] he is allowing [J.R.] back in the school." The judge responded, "Okay," and then inquired whether other "services and supports" had been identified to assist J.R. and his mother. J.R.'s counsel said that his office was working on educational services and that an educational advocate had been appointed. The judge then received information on J.R.'s anticipated enrollment in summer school and his possible participation in summer camp.
After concluding that discussion, the judge asked J.R.'s sister, C.R., "Was there anything that you wanted to add or any additional services that you think would assist ... your brother in being successful at home?" C.R. stated that she and other family members had discussed a "house arrest" or home monitoring arrangement for her brother"if he on some sort of system that lets him know[,] [`]if I don't go home they are going to know I ain't go home.[']"but had decided that "every time he don't come home we're just going to report him," and he would know it. Picking up on C.R.'s idea, the judge asked counsel for J.R. and the government about the possibility of implementing third-party monitoring. With their consent, the judge declared that she would add third-party *539 monitoring as a condition of J.R.'s probation. Next, after confirming that J.R. had been receiving his prescribed medication while he was in pre-trial custody, the judge set a new date for his probation review, "just so we can be sure that [J.R.] had a good plan in place for the summer." The judge then admonished everyone present to remain in close contact with J.R.'s probation officer and stated that she would "put the order in place for the third party monitoring."
Finally, the judge turned to "the logistics of having J. available" to testify at appellant's trial. Although the prosecutor expressed a desire to defer J.R.'s discharge from custody until he finished testifying, the judge signed an order for his immediate release. The judge then addressed J.R. directly for the first time in the hearing, advising him as follows:
All right. J., J., look at me. You are going to be released today because this case is being dismissed but as you know [the prosecutor] has just subpoenaed you to testify today before me in this case. Okay? So, ... you are going to be released from the cell block room but you may not leave the Court building. You are going to be released from there and [your attorney] and your mom are just going to sit with you outside the courtroom. Okay. So, you are not to leave the building under any circumstances until you are excused by me or by ... the Government counsel. Do you understand that? ... Mr. R., do you understand that?
J.R. replied, "Yes." Shortly afterward, the judge began hearing appellant's case.
J.R. was the government's key witness. According to J.R., he and appellant were on the third floor of the Taft Center "skipping breakfast time" and "playing around." Appellant, who was carrying a "torch" (i.e., a cigarette lighter), told J.R. "that he didn't take his medicine" and said, "I wonder if [I] light [sic] the school on fire." Appellant walked into one of the classrooms and invited J.R. to follow him. They sat on a sofa and appellant lit a cigar. Appellant then reached inside the file cabinet and set fire to some files inside a black plastic crate. J.R. "tr[ied] to stomp it out" and then left the room as appellant was still trying to ignite the files. J.R. called out to appellant and the two left together.
Testifying in his own defense, appellant placed the blame for the fire on J.R. Appellant claimed that J.R. took his cigarette lighter from him and used it to set fire to the papers in the file cabinet. Appellant said he then found a jug of water, poured it into "little science cups," and threw the water on the fire in an effort to extinguish it. Appellant asserted that if he had started the fire, he would have pleaded guilty "because my UUV's [are] way worse than this, the way I've been hitting cars and all that."
In rebuttal, the government recalled Matthews, the Taft Center's principal, to play the surveillance videotape showing that only appellant entered the classroom where the fire occurred.[5] The government also called Sergeant Phillip Proctor, a firefighter who had questioned appellant about the fire. Proctor said appellant told him other individuals had set it, "but he did not want to snitch on those individuals and say who they were." Appellant did *540 not tell Proctor that it was J.R. who had started the fire.
In finding appellant guilty, the judge declined to rely on the videotape because she questioned its completeness and believed that J.R. and appellant both were present in the classroom when the fire was set. The issue turned on the credibility of their conflicting accounts, and the judge resolved that issue in favor of J.R. and against appellant:
After considering all of the testimony and having an opportunity to assess the credibility of both Mr. R. and Mr. M as well as the arguments that are being [p]ut forth by counsel as to why one or the other might have a motivation or an incentive to fabricate their testimony[,] I do find that the account of what transpired on April 23rd that was given by J.R. ... was the far more credible account of what transpired[.]
The judge accordingly found that "the Government has met its burden to establish beyond a reasonable doubt [appellant's] involvement in both the charges." With respect to the mens rea element of the two charges, the judge specifically found that appellant acted in "conscious disregard" of known and substantial risks to the property and to the security of the building's occupants.

II.
Appellant's primary contention is that the trial judge erred in failing to recuse herself. Appellant argues that the judge violated two different canons of judicial ethics by speaking to J.R., speaking to others about J.R., and reading his probation report just before he became an important witness for the prosecution in appellant's trial: (1) the canon prohibiting ex parte communications, and (2) the canon requiring recusal when the judge's impartiality might reasonably be questioned. Appellant failed to raise these claims below, and the government argues that they are subject to review only for plain error. In some cases we have declined to so limit our review of unpreserved claims of judicial bias, recognizing that it may be unfair to expect a defendant to challenge the integrity of the judge who is about to adjudicate his guilt or impose his sentence.[6] Here, though, appellant and his counsel knew the trial judge was about to speak to J.R., and appellant's counsel, as a member of the D.C. Bar, was free to remain in the courtroom and attend the proceeding.[7] Under these circumstances, plain error review would seem appropriate because appellant was afforded a fair opportunity to be present (through his counsel) during the communications and to express any concerns he may have had without attacking the judge's integrity. We need not resolve this question, however, because we conclude there was neither an improper ex parte communication concerning appellant or his case nor any actual or apparent bias on the judge's partand hence there was no violation of the canons of judicial ethics, plain or otherwise.

A.
Subject to exceptions not applicable to this case, Canon 3(B)(7) of the Code of Judicial Conduct provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a *541 pending or impending proceeding...."[8] In appellant's view, the trial judge violated this canon both by "initiat[ing]" and by "consider[ing]" the colloquy regarding J.R.'s placement.[9]
"Ex parte communications are those that involve fewer than all of the parties who are legally entitled to be present during the discussion of any matter and are prohibited in order to ensure that every person who is legally interested in a proceeding is given the full right to be heard according to law."[10] The colloquy with and about J.R. therefore involved an "ex parte communication" only if appellant had a right to be present. While appellant had a right to be present at every stage of his own proceeding,[11] he had a right to be present during J.R.'s meeting with the judge only if that meeting involved communications concerning appellant or his pending case.[12] Thus the distinction drawn in Canon 3(B)(7) between "ex parte communications" and "other communications... concerning a pending or impending proceeding" need not detain us.[13] However we categorize the communications to which appellant was not privy, the dispositive question is whether they pertained to appellant or the allegations or evidence against him.
They did not. There was no mention of appellant or the facts of his case during the judge's colloquy with and about J.R. Appellant argues that the judge heard information that cast J.R. in a positive light, thereby making the judge more likely to credit his imminent testimony for the prosecution. Specifically, appellant points to the social worker's report that the principal was allowing J.R. to return to school. We are not persuaded; it is fanciful to construe that statement as an endorsement of J.R.'s character, let alone his character for truthfulness. And we see nothing else in the colloquy that bore on J.R.'s credibility.
Appellant also points to the fact that the trial judge read J.R.'s probation report before the trial beganperhaps, though the record is not clear, before the government *542 dismissed J.R. from the case. This was dangerous. Probation reports, like presentence reports, may contain a considerable amount of information about the probationer and his behavior that is not subject to cross-examination or the rules of evidence.[14] If the trial judge had read a probation report on appellant before sitting as the finder of fact in his delinquency trial, we might think reversal was required.[15] As it is, however, there is no claim or indication that the judge read appellant's probation report before she adjudicated him delinquent, and appellant points to nothing in J.R.'s probation report bearing on appellant, J.R.'s credibility, or the offense with which they had been jointly charged.[16]
There likewise is no sign that the judge's findings of fact in appellant's case were influenced in any way by J.R.'s probation report or the colloquy concerning him. So far as it appears, the information the judge elicited or obtained from those sources was irrelevant to appellant and his case, and appellant has not rebutted the presumption that a judge, sitting as finder of fact, will "disregard all irrelevant matters in making [his or her] adjudications."[17] On this record, we can see no violation of the prohibition in Canon 3(B)(7) against initiating or considering ex parte communications or other communications outside the parties' presence concerning a pending or impending proceeding.

*543 B.
The second canon of the Code of Judicial Conduct on which appellant relies, Canon 3(E)(1), instructs a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]"[18] This injunction establishes an objective standard that obliges the judge to "recuse from any case in which there is an appearance of bias or prejudice sufficient to permit the average citizen reasonably to question the judge's impartiality."[19] Importantly, the test is whether the facts would create a reasonable doubt about the judge's partiality in the mind of a person with knowledge of all the relevant circumstances.[20]
That test is not met here. The only reason appellant advances for asserting a violation of Canon 3(E)(1) is the trial judge's alleged receipt of ex parte information from her review of J.R.'s status. However, as we have said, the record affords no basis for thinking that the judge solicited or received any communication bearing on appellant or his case. Appellant himself therefore had no right to be present during the discussion about J.R., and the judge did not bar his counsel, who could have attended it, from doing so. In our view, a reasonable person informed of these facts would not doubt the judge's impartiality in presiding over appellant's case.

III.
Appellant's other claims on appeal merit only brief discussion. We reject appellant's contention that there was insufficient evidence of his malice to convict him of arson. Viewed in the light most favorable to the government, the evidence showed that appellant wondered aloud what would happen if he tried to set the school on fire; that he started the fire with a cigarette lighter; that he continued to try to set the fire despite J.R.'s attempts to extinguish the blaze; and that appellant did not notify anyone about the fire. The trial judge reasonably could find, as she did, that appellant intentionally set the fire in conscious disregard of a known and substantial risk that his actions would endanger the school's occupants.[21]
We similarly reject appellant's claim that there was insufficient evidence to convict him of felony (as opposed to misdemeanor) destruction of property. Even if appellant intended only to set fire to some old files having de minimis value, there was sufficient evidence that he consciously disregarded the risk that the fire would spread (as it did) to surrounding school *544 property "of the value of $200 or more."[22]
Lastly, appellant argues that Matthews's testimony on rebuttal that appellant "was overheard ... asking what would happen if he burned the school down" was so prejudicial that it entitles him to a new trial. When the prosecutor elicited the testimony, appellant moved to strike ita request the judge granted. Appellant did not seek a mistrial. We therefore review his current claim only for plain error. When an appellant argues that the trial judge should have declared a mistrial sua sponte, even if the trial was before a jury we consider only "whether the judge compromised the fundamental fairness of the trial, and permitted a clear miscarriage of justice, by not intervening" on his or her own motion.[23] In this case, a bench trial, "it was incumbent upon [the judge] to terminate the trial only if [she] believed [she] had been exposed to comments that prevented [her] from reaching a verdict solely on the relevant evidence."[24] We cannot say the judge abused her discretion in believing she could ignore the comment she struck from the record. We see no reason to think the judge was influenced by the stricken portion of Matthews's rebuttal testimony.[25]

IV.
For the foregoing reasons, we conclude that the trial judge did not err by initiating or considering an ex parte communication or by failing to recuse herself, and that appellant's other assignments of error are without merit.
Affirmed.
NOTES
[1] D.C.Code § 22-301 (2001).
[2] D.C.Code § 22-303 (2001).
[3] Olinger testified that it would cost $319 to replace the storage cabinet and $300 to replace the file cabinet with comparable new ones; that painting supplies would cost around $17; and that "the rest would be in labor about $1,200 but it probably could exceed that because [of] the electrical work that would need to be done." The witness did not otherwise explain why his total cost estimate was $3,000 even though his figures added up to around $1,850.
[4] See Super. Ct. Juv. R. 53(a)(1) ("Pursuant to D.C.Code § 16-2316(e), the general public shall be excluded from judicial hearings concerning juvenile delinquency or persons in need of supervision.").
[5] The prosecutor also asked Matthews whether appellant was overheard making any statements prior to the fire. Matthews answered that appellant "was overheard saying, asking what would happen if he burned the school down." Appellant immediately objected to this testimony and, following argument, the judge ruled that it should have been introduced in the government's case-in-chief and ordered it stricken from the record.
[6] See, e.g., Belton v. United States, 581 A.2d 1205, 1212 & n. 7 (D.C. 1990).
[7] See Super. Ct. Juv. R. 53(a)(2)(A).
[8] DISTRICT OF COLUMBIA CODE OF JUDICIAL CONDUCT Canon 3(B)(7) (1995).
[9] See Foster v. United States, 615 A.2d 213, 216 (D.C.1992) (suggesting that "initiating" and "considering" are separate violations).
[10] Harris v. United States, 738 A.2d 269, 277 (D.C.1999) (internal quotation marks, brackets and citation omitted). See also Clifton v. United States, 363 A.2d 299, 301 (D.C.1976) ("Any discussion with the trial judge relating to the trial should be conducted only in the presence of all counsel.") (emphasis added).
[11] See Super. Ct. Juv. R. 43; cf. Super. Ct. Crim. R. 43(a) ("The defendant shall be present... at every stage of the trial....").
[12] Cf. In re W.T.L., 656 A.2d 1123, 1129 (D.C. 1995) (holding that trial judge "engaged in prohibited ex parte communications about appellant" by discussing his conduct in his and his counsel's absence with another juvenile during the latter's disposition hearing); United States v. Spears, 197 F.3d 465, 470 (10th Cir.1999) ("Criminal defendants have a right to be present ... at a presentence hearing in a co-defendant's case if the testimony at the hearing will affect the defendant's sentence.") (emphasis added); United States v. Anaya, 32 F.3d 308, 314 (7th Cir.1994) (suggesting that a defendant does not have an absolute right to be present at a co-defendant's sentencing, but merely a right to advance notice of the information presented at that sentencing if the trial court intends to rely on it in passing sentence).
[13] See Harris, 738 A.2d at 277 n. 13 ("We have treated situations in which a trial court has received ex parte communications where no interested party was present in the same manner as those cases where the communication was received at the instance and for the benefit of one party only[.]") (internal quotation marks omitted) (citing In re W.T.L., 656 A.2d 1123 (D.C. 1995)).
[14] See D.C.Code § 24-303 (2001) ("The probation officers shall carefully investigate all cases referred to them by the court, and make recommendations to the court to enable it to decide whether the defendant ought to be placed under probation, and shall report to the court, from time to time as may be required by it, touching all cases in their care, to the end that the court may be at all times fully informed of the circumstances and conduct of probationers.").
[15] Cf. Gregg v. United States, 394 U.S. 489, 492-93, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969) (suggesting that reversal of conviction would have been required if the trial judge had read a presentence report on the defendant before the jury returned its verdict; "[t]o permit the ex parte introduction of this sort of material to the judge who will pronounce the defendant's guilt or innocence or who will preside over a jury trial would seriously contravene the ... purpose [of Criminal Rule 32] of preventing possible prejudice from premature submission of the presentence report."). See also Super. Ct. Juv. R. 32(b)(1) ("The [predisposition] report shall not be submitted to or considered by the judicial officer, or its contents disclosed to anyone, unless the respondent has pleaded guilty or has been found guilty or in need of supervision.").

While Canon 3(B)(7)(c) provides, as an exception to the general rule against ex parte communications, that "[a] judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities," we consider that exception inapplicable to a judge's perusal of a presentence or probation report on a respondent (or defendant) prior to a finding of guilt. Probation officers do fall within the category of "court personnel" for the purposes of the exception, see Foster v. United States, 615 A.2d 213, 218 (D.C.1992), but before guilt has been determined, they have no role in "aid[ing] the judge in carrying out the judge's adjudicative responsibilities."
[16] We presume that appellant and his counsel have not seen J.R.'s probation report, as it is a confidential juvenile social record. See D.C.Code § 16-2332 (2001 & Supp.2009); Super. Ct. Juv. R. 55(b)(3). The probation report is not part of the record before us, and we have not inspected it. Because "it is appellant's duty to present this court with a record sufficient to show affirmatively that error occurred," Cobb v. Standard Drug Co., 453 A.2d 110, 111, (D.C.1982), and appellant could have moved to supplement the record on appeal with J.R.'s probation report, see D.C.App. R. 10(e), we do not remand for a hearing to ascertain its contents.
[17] In re W.N.W., 343 A.2d 55, 58 (D.C. 1975).
[18] DISTRICT OF COLUMBIA CODE OF JUDICIAL CONDUCT Canon 3(E)(1) (1995). The Canon tracks the language of 28 U.S.C. § 455, which governs the disqualification of federal judges, and in construing it we may look to federal case law interpreting that statute for guidance. Belton v. United States, 581 A.2d 1205, 1213 (D.C. 1990).
[19] Garrett v. United States, 642 A.2d 1312, 1315 (D.C. 1994) (internal quotation marks and brackets omitted).
[20] See Sao Paulo State of the Federative Republic of Braz. v. Am. Tobacco Co., 535 U.S. 229, 232-233, 122 S.Ct. 1290, 152 L.Ed.2d 346 (2002) (citing Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 861, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)).
[21] Contrary to appellant's argument, the judge thus correctly found that he acted with malice. See Phenis v. United States, 909 A.2d 138, 163-64 (D.C.2006) ("With respect to arson, the government must prove that appellant acted intentionally, and not merely negligently or accidentally, while consciously disregarding the risk of endangering human life and offending the security of habitation or occupancy.") (internal quotation marks omitted).
[22] D.C.Code § 22-303 (2001).
[23] Lewis v. United States, 930 A.2d 1003, 1008 (D.C.2007) (internal quotation marks omitted).
[24] McKoy v. United States, 263 A.2d 645, 648 (D.C. 1970).
[25] See, e.g., Singletary v. United States, 519 A.2d 701, 702 (D.C.1987) (noting "presumption that a trial judge, in deciding a case, will disregard any inadmissible evidence and any improper argument").