Gary A. PLUMMER, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CM–1299.

District of Columbia Court of Appeals.

Submitted June 28, 2011.

Decided May 10, 2012.

Moses A. Cook was on the brief for appellant.

Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, and Kevin Andrew Chambers, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and FISHER, Associate Judges, and SCHWELB, Senior Judge.

GLICKMAN, Associate Judge:

After a bench trial, appellant Gary Plummer was convicted of two counts of deceptive labeling in violation of D.C.Code § 22–3214.01 (2001).[1] Seeking to overturn those convictions on appeal, he argues that the trial judge should have recused himself after presiding over his unsuccessful attempt to plead guilty. Appellant further contends that the judge committed reversible error by admitting certain evidence, and that if the two counts of conviction survive, they should merge. We conclude that appellant waived any disqualification on the judge's part and is not otherwise entitled to the relief he seeks.

## I.

On August 11, 2007, Officer Jeff Janczyk and two other police officers were in an unmarked police car on Georgia Avenue in Northwest Washington, D.C., when they noticed appellant engaging people in conversation outside the Petworth Metro Station. At first Officer Janczyk thought appellant was panhandling, but then he saw that appellant was holding some DVDs in his hand. Leaving the car and approaching appellant to investigate, Officer Janczyk observed cases of DVDs in appellant's open backpack. After making inquiry, the officers arrested appellant for violating the deceptive labeling law and seized his backpack, which contained an assortment of DVDs and CDs along with appellant's cell phone and business cards.

Appellant was charged by information with two counts of deceptive labeling—one count for the sound recordings (the CDs) found in his backpack, and the other count for the audiovisual works (the DVDs).[2] When the case was called for trial on November 14, 2007, appellant's counsel announced that appellant proposed to plead guilty to both counts. In response to a question from the judge, appellant confirmed that he wished to plead guilty to the information. Appellant stated that, on his counsel's advice, he was "just trying to get this over with .... and not to waste the court's time."

Upon hearing the prosecutor's initial factual proffer at the beginning of the Rule 11 inquiry,[3] however, the judge expressed doubt as to whether the government could prove that appellant had the requisite intent to distribute the merchandise found in his possession for "commercial advantage or private financial gain."[4] The prosecutor consulted with his police witnesses and then indicated to the judge that they actually saw appellant offering the counterfeit discs to several people standing around him outside the Petworth Metro Station. The judge then turned to appellant and asked him directly whether the proffer was true and whether he was "trying to sell those DVDs and CDs at the Metro?" To that, appellant replied: "No, no, no, no, no, no." Appellant declared that the proffer was "entirely false" and "didn't happen"; he denied that he was "surrounded by a bunch of people" and claimed that he

---

1. The statute provides that "[a] person commits the offense of deceptive labeling if, for commercial advantage or private financial gain, that person knowingly advertises, offers for sale, resale, or rental, or sells, resells, rents, distributes, or transports, or possesses for such purposes, a sound recording or audiovisual work, the label, cover, or jacket of which does not clearly and conspicuously disclose the true name and address of the manu-

facturer thereof." D.C.Code § 22–3214.01(b) (2001).

2. *See* D.C.Code § 22–3214.01(a)(1), (3) (defining the terms "audiovisual works" and "sound recordings").

3. *See* Super. Ct.Crim. R. 11.

4. D.C.Code § 22–3214.01(b).

had just left a restaurant across the street from the Petworth Station and was "getting on the Metro" when the police stopped him. Following this denial by appellant of the charges against him, the judge stated that he could not accept a guilty plea and "we need to have a trial." Appellant's counsel said, "That's fine, Your Honor."

After a brief break, the trial began—a non-jury proceeding over which the judge presided as trier of fact. After only a few minutes, however, the judge interrupted the proceedings to raise, *sua sponte*, the question of his own recusal:

> THE COURT: Excuse me just a minute. . . . [D]uring the time that we were initially conducting a Rule 11 inquiry here, I'm trying to remember whether there was a time when [appellant] said in answer to any of my questions that he was guilty of these offenses. Because, if so, absent a waiver from him, I shouldn't be presiding over a non-jury trial where somebody has admitted their guilt at some point in a plea proceeding that gets aborted.

Stating that he had "no memory of [appellant] admitting his guilt," and that he felt "completely unaffected by the [plea] proceeding in terms of being able to fairly judge the evidence in this case," the judge inquired whether anyone had a different recollection or objected to his continued participation in the trial. He "just want[ed] to make sure that . . . somewhere along the line . . . [appellant] didn't volunteer that he was guilty." In response, appellant's counsel agreed that appellant "did not indicate that he was guilty of any criminal act." The prosecutor added that "[i]t had never gotten to the point where" appellant was asked whether he pleaded guilty to the charges.

The judge asked appellant's counsel to "make sure that Mr. Plummer has no ob-

jection, and then I'll ask him directly on the record as to whether or not it's agreeable for me to proceed to try this case[.]" Appellant and his counsel conferred off the record, after which counsel reported back to the judge as follows:

> DEFENSE COUNSEL: Thank you, Your Honor. I have discussed the matter with my client. I have asked him if he feels he admitted guilt during the proceedings. He indicates that he did not. I asked him if he believes that he said something that the court would conclude that he was guilty on even if he didn't admit it. He has indicated that he does not believe he said that. I asked him specifically if he had any objection to Your Honor trying this case, to hearing the evidence in this case and reaching the decision based upon what has transpired here today. He indicates that he has no objection.

The judge then addressed appellant personally and asked him if his counsel had spoken truly. Appellant confirmed that what his counsel said was "correct."

Satisfied that he could hear the case without objection, the judge proceeded with the trial. Officer Janczyk testified to his observations of appellant outside the Petworth Metro Station and identified the physical evidence against him: appellant's backpack, his business cards, and a total of 30 DVDs and 39 CDs discovered in the backpack. (As discussed below, the DVDs and CDs were admitted in evidence over appellant's objection that the government had not established a proper chain of custody for them.) Many of the discs were duplicates.

The government called two expert witnesses to testify that the discs were deceptively labelled copies. Michael Leroy Middleton, a consultant to the Recording Industry Association of America, was qualified as an expert on illegal recording

and deceptive labeling of CDs. He testified that he had examined five of the CDs taken from appellant and had determined that none of them displayed the manufacturer's true name and address. Based on the inferior packaging and appearance of the CDs, Middleton opined that they were obviously illegal copies. Over appellant's objection (which we discuss below), Middleton also testified that, in his opinion, appellant's possession of multiple copies of counterfeit CDs indicated that he was selling them.

Allan Meyer, qualified as an expert in the manufacturing and distribution of DVDs, provided similar testimony. He identified several features of the DVDs found in appellant's backpack, including their packaging, film quality, and lack of appropriate codes, that revealed they were not legal copies. Meyer also opined that the DVDs were obviously counterfeit, and that possession of multiple copies was consistent with an intent to offer them for sale.

Appellant did not testify or present any other evidence in his defense. At the conclusion of the trial, the judge found him guilty on both counts of deceptive labeling.

## II.

Appellant's foremost contention in this court is that the trial judge violated Canon 3(E)(1) of the 1995 District of Columbia Code of Judicial Conduct and thereby denied him his due process right to a neutral arbiter by presiding over his trial after having heard him express his intention to plead guilty.[5] Appellant raises this claim for the first time on appeal; at trial, as described above, he expressly declined to object to the judge's participation on the grounds now advanced. We reject the claim. In the first place, we are not persuaded that appellant or his counsel said anything in the truncated plea proceeding that obligated the judge to recuse himself. But even assuming the judge was subject to a disqualification under Canon 3(E)(1) because an objective observer reasonably might have questioned his ability to remain impartial, appellant elected not to question it, and we conclude that he waived his assumed right to recusal and is barred from asserting it now.

As the trial judge recognized, his recusal from sitting as the trier of fact clearly would have been warranted had appellant actually admitted his guilt or otherwise incriminated himself in the plea proceeding.[6] While such an acknowledgment

---

5. In pertinent part, the 1995 Code provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned...." CODE OF JUDICIAL CONDUCT FOR THE DISTRICT OF COLUMBIA COURTS Canon 3(E)(1) (1995). The 1995 Code was in force at the time of appellant's trial. *See York v. United States*, 785 A.2d 651, 655 n. 7 (D.C.2001). It was replaced as of January 1, 2012, by a code based on the American Bar Association's 2007 Model Code of Judicial Conduct. *See* CODE OF JUDICIAL CONDUCT FOR THE DISTRICT OF COLUMBIA COURTS, Preface at i (2012). The counterpart to Canon 3(E)(1) in the 2012 Code is Rule 2.11(A), which, with a slight change of wording, continues to require a judge to "disqualify himself or herself in *any*

[rather than "a"] proceeding in which the judge's impartiality might reasonably be questioned...." (Emphasis added.)

6. *See Banks v. United States*, 516 A.2d 524 (D.C.1986). The defendant in *Banks* expressed a willingness, on the second day of his non-jury trial, to accept the government's offer and plead guilty to three counts of unlawful distribution of cocaine and one count of unlawful distribution of heroin. In the ensuing Rule 11 inquiry, however, he told the judge, "the only part that I did sell [is] the cocaine, but I didn't sell any heroin." *Id.* at 526 (alteration in original). The judge therefore rejected the guilty plea. This court held that the judge "should have recused himself from sitting as the trier of fact after Banks

would have been inadmissible at trial,[7] it would have been difficult for any trier of fact to put it out of mind, and, at the very least, the impartiality of the judge who heard it reasonably could be questioned by "an objective observer"[8] or "average citizen."[9] Impartiality, as our current 2012 Code helpfully defines it, means not only the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties," but also the "maintenance of an open mind in considering issues that may come before a judge."[10] Even "[t]he disciplined judicial mind should not be subjected to any unnecessary strain; ... the most austere intellect has a subconscious."[11]

Here, though, appellant made no incriminating admissions. He expressed his readiness to plead guilty, but when the moment of truth arrived in the Rule 11 inquiry, appellant denied having tried to sell the CDs and DVDs, necessitating the rejection of his plea. Under some circumstances, the appearance, if not also the reality, of judicial impartiality may be in jeopardy if a judge in a non-jury trial has been informed only that the defendant desired to plead guilty but the plea was rejected or withdrawn.[12] But judges know that "pleas of guilty are often offered for reasons other than actual guilt,"[13] and in most situations we repose confidence in the ability of judges to disregard inadmissible evidence.[14] Here, where the trial

admitted his guilt on the cocaine charges" in the Rule 11 proceeding. *Id.* at 525; *see also id.* at 529 ("Our prior decisions make clear that the preferable procedure would have been for the trial judge to certify the case to another judge for trial after he rejected the plea.") (footnote omitted).

**7.** *See* Super. Ct.Crim. R. 11(e)(6)(C) (providing that, with limited exceptions not applicable here, a statement made by a defendant in the course of a guilty plea proceeding is inadmissible against that defendant in any civil or criminal proceeding).

**8.** *Belton v. United States,* 581 A.2d 1205, 1214 (D.C.1990) (explaining that, in applying what later became Canon 3(E)(1), we must ask whether the circumstances "could lead 'an objective observer' reasonably to question the judge's impartiality") (quoting *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 861, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)); *see also In re M.C.,* 8 A.3d 1215, 1222 (D.C. 2010) ("Recusal is required if an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case.") (internal quotation marks and emphasis omitted).

**9.** *York,* 785 A.2d at 654 (internal quotation marks omitted).

**10.** Code of Judicial Conduct for the District of Columbia Courts, Terminology at 4 (2012).

**11.** *United States v. Walker,* 473 F.2d 136, 138 (D.C.Cir.1972).

**12.** *See Walker,* 473 F.2d at 138 (suggesting, as a general rule, that "once the trial judge has received information that a plea of guilty has been offered [by the defendant], it would be better if [the judge] exercised his prerogative to recuse himself or to insist upon a jury trial, where the findings of fact could be made by that body"); *cf. Banks,* 516 A.2d at 529 n. 7 (suggesting that a trial judge informed mid-trial of a defendant's intention to plead guilty may certify the Rule 11 inquiry to another judge in order to avoid hearing any admissions of guilt, and may retain the trial if the guilty plea is rejected).

**13.** *Walker,* 473 F.2d at 138. In the present case, appellant stated at the outset that he proposed to plead guilty because he was "just trying to get this over with."

**14.** "The ... Judge is presumed to have a trained and disciplined judicial intellect, which in a nonjury trial can receive evidence, rule on its admissibility, and discard from his eventual decision on the merits that evidence which he has ruled to be inadmissible for the purposes of his decision." *Id.; see also In re M.C.,* 8 A.3d at 1230 n. 19.

judge learned that appellant was not admitting guilt and thereafter assured the parties that he was unaffected by the aborted plea proceeding, we doubt that an objective observer would entertain a serious question about the judge's impartiality. Certainly appellant and his counsel expressed no such concern when the question was squarely put to them at trial.

And that brings us to the crux of the matter. Even if we were to posit that the judge was subject to disqualification, this is not a case in which appellant merely forfeited his claim by voicing no objection at trial. Were that all, his claim still would be reviewable, albeit only for plain error. Here, however, appellant expressly declared that he did not object to the judge presiding over the trial despite his conduct of the Rule 11 inquiry. By inviting and inducing the judge to continue as trier of fact, appellant waived his current claim that the judge should have recused himself, and we conclude that his waiver is final.

 This is the general rule: "A party may not allege on appeal as error an action which he had induced the tribunal to take." [15] Strictly speaking, "the bar is not absolute," but an otherwise valid waiver of this sort may be overcome only in "extreme situations," as where it is against public policy.[16] Thus, we proceed to consider whether the judge's putative disqualification was waivable as a matter of law, and, if so, whether the waiver in this case was ineffective for any other reason.

 The canons of judicial ethics allow the parties to waive a judge's disqualification, with one exception. Canon 3(F) of the 1995 Code, in effect at the time of appellant's trial, specified that waiver is allowed with respect to "any basis for disqualification *other than* personal bias or prejudice concerning a party." [17] For the purposes of that proviso, it is generally understood that "personal" means that the source of the bias or prejudice is extrajudicial.[18] Because the only alleged source of the trial judge's putative disqualification in this case was the Rule 11 inquiry, which was part and parcel of the judicial proceeding under way, this cannot be said to be a case of personal bias or prejudice; nor, on the record before us, do we perceive any other reason to attribute the slightest degree of bias or prejudice to the judge.[19] As a result, we conclude that the judge's recusal was waivable by appellant.

---

15. *District of Columbia v. Wical Ltd. P'ship,* 630 A.2d 174, 183 (D.C.1993) (internal quotation marks and brackets omitted); *see, e.g., Preacher v. United States,* 934 A.2d 363, 368 (D.C.2007) ("Generally, the invited error doctrine precludes a party from asserting as error on appeal a course that he or she has induced the trial court to take.").

16. *Wical Ltd. P'ship,* 630 A.2d at 183.

17. Code of Judicial Conduct for the District of Columbia Courts Canon 3(F) (1995) (emphasis added). The counterpart to Canon 3(F) in the 2012 Code, Rule 2.11(C), continues this "personal bias or prejudice" exception to the general rule that judicial disqualification may be waived. Code of Judicial Conduct for the District of Columbia Courts Rule 2.11(C) (2012).

18. *See In re M.C.,* 8 A.3d at 1225; *cf. Liteky v. United States,* 510 U.S. 540, 554, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (concluding that "[t]he fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice") (emphasis omitted).

19. Even if, following *Liteky,* we acknowledge that, in unusual circumstances, a judge could develop a disqualifying personal bias or prejudice based upon what happens in the courtroom, we find no support in the record for the supposition that such a development occurred here. "[O]pinions formed by the judge on the basis of facts introduced or

Whether a right is capable of being waived and whether it actually has been waived are separate inquiries. Canon 3(F) of the 1995 Code spells out a particular procedure for "remittal" (i.e., waiver) of disqualification:

A judge disqualified by the terms of Section 3E may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, outside of the presence of the judge, whether to waive disqualification. If following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties and lawyers, without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding. The agreement shall be incorporated in the record of the proceeding.[20]

The trial judge substantially complied with this procedure: He informed the parties of the basis on which he possibly might be disqualified; asked for their recollections as to whether that basis existed (whether appellant made any disqualifying admissions); neutrally inquired whether the parties objected to his trying the case; stated his willingness to continue with the trial if they did not object; allowed appellant time to consult with his attorney; and

ascertained on the record that there was no objection to his continuing participation. Appellant argues that Canon 3(F) requires the waiver of disqualification to originate with the parties rather than the judge, and that this requirement was not complied with here because it was the judge who brought up the subject. Appellant is mistaken on this point, because Canon 3(F) explicitly allows judges to "ask the parties and their lawyers to consider ... whether to waive disqualification." This language "was added at the end of the first sentence to make clear that a judge is not entirely precluded from initiating an inquiry into waiver of possible grounds for disqualification. If it is appropriately framed by full disclosure of the basis for possible disqualification, and if the parties and their lawyers are allowed to consider the question outside the judge's presence, an inquiry as to whether the parties have any objection to the judge's further participation is permissible."[21]

Nonetheless, in one principal respect, the judge did deviate from the mandated procedure. He did not inform the parties of their right to consider the matter outside of his presence. So far as we can tell from the record, the conversation between appellant and his attorney took place in the courtroom, and hence in the

events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." 510 U.S. at 555, 114 S.Ct. 1147.

20. The same procedure is described in Rule 2.11(C) of the 2012 Code. CODE OF JUDICIAL CONDUCT FOR THE DISTRICT OF COLUMBIA COURTS Rule 2.11(C) (2012).

21. ANNOTATED MODEL CODE OF JUDICIAL CONDUCT, Commentary at 248–49 (2004). We note that the Commentary to Canon 3(F) states further

that "[t]o assure that consideration of the question of remittal is made independently of the judge, a judge must not solicit, seek or hear comment on possible remittal or waiver of the disqualification unless the lawyers jointly propose remittal after consultation as provided in the rule." *Id.* Commentary at 248. This commentary is meant to "emphasiz[e] the need for the parties and lawyers to consider the question of remittal independently of the judge." *Id.* Annotation at 249. It should not be read to contradict the express terms of the Canon, which allow the judge to raise the subject of waiver.

presence of—in relatively close proximity to—the judge on the bench.

The purpose of asking the parties to consider the question of remittal outside the judge's presence "is to ensure the decision is made independent of any influence of the judge." [22] Because it is clear from the record before us that appellant had the opportunity to confer privately with his counsel, and that the judge did not intrude in their colloquy or seek to influence appellant's decision in any way, we are satisfied that the failure to ask the parties to consider the question outside the judge's presence was harmless—it did not comport with Canon 3(F), but neither did it undermine the validity of appellant's waiver of the judge's disqualification.[23]

We considered a factually similar situation more than a half century ago, long before the remittal procedure in Canon 3(F) was adopted. In *Turner v. Davis, Wick, Rosengarten Co.,*[24] the trial judge

disclosed that he had known one of the witnesses "for a great many years" and viewed him "very favorably." [25] The judge asked the parties if, for that reason, they would prefer he not adjudicate the case. After conferring with his client, defense counsel indicated that he did not object to the judge's doing so. On appeal, however, the defendant argued that the judge should have recused himself. We held that the objection came "too late": "One who declines an opportunity to object before trial cannot be allowed to hold his objection in reserve to await the outcome of the case." [26]

■ Other courts similarly have held, almost without exception, that when a party has actual knowledge of the grounds for judicial disqualification, the failure to make a timely objection operates as a waiver.[27] Our court has been somewhat wary about finding a waiver or forfeiture of a judicial disqualification claim from a litigant's si-

22. *State v. Jacobson,* 747 N.W.2d 481, 489 (N.D.2008) (construing North Dakota Code of Judicial Conduct Canon 3(F), a provision identical to Canon 3(F) of the 1995 District of Columbia Code of Judicial Conduct).

23. The North Dakota Supreme Court reached the same conclusion in *Jacobson,* holding that the judge's failure to have the parties consider outside his presence whether to waive his disqualification, as required by Canon 3(F), did not invalidate the waiver, as there was no evidence the judge influenced their decision. *See id.* at 489–90.

24. 131 A.2d 303 (D.C.1957). *Turner* was a decision of this court, which then was named the Municipal Court of Appeals for the District of Columbia. As such, it is "binding on a division of this court unless overruled en banc or unless it is inconsistent with (hence was effectively overruled by) a subsequent decision of the United States Court of Appeals for the District of Columbia Circuit issued before February 1, 1971." *Thoma v. Kettler Bros., Inc.,* 632 A.2d 725, 727 n. 5 (D.C.1993) (citing *M.A.P. v. Ryan,* 285 A.2d 310, 311–12 (D.C.1971)).

25. 131 A.2d at 304.

26. *Id.*

27. *See, e.g., United States v. Barrett,* 111 F.3d 947, 951–53 (D.C.Cir.1997) (citing cases) ("Barrett did not request recusal below and has therefore waived his right to do so here. More than one court has recognized the sensible principle that a defendant cannot take his chances with a judge and then, if he thinks that the sentence is too severe, secure a disqualification and a hearing before another judge.") (internal quotation marks and brackets omitted); *see generally* JAMES J. ALFINI ET AL., JUDICIAL CONDUCT AND ETHICS § 4.14 (4th ed. 2010) ("Once a judge discloses disqualifying facts and there is no objection, it may be assumed that any objection to the possible disqualification is waived.... Given the importance of court proceedings, not to mention their time and expense, a party should not be able to save an objection until a later date as a hedge against losing a case.") (footnotes omitted).

lence alone, at least in circumstances where the objection would be tantamount to attacking the judge's integrity just before the judge was about to make a crucial discretionary ruling.[28] But there were no such extenuating circumstances here. There was no coercion or undue pressure on appellant. The judge himself identified the possible basis for his disqualification and expressed his amenability to recusal. Given the choice, and with the advice of counsel, appellant elected to decline the judge's offer. As the grounds for disqualification were waivable, appellant's choice to have the judge continue to preside must be classified as a deliberate trial strategy.[29] We therefore hold that appellant waived his claim that the trial judge was disqualified.

### III.

■ Appellant also presents two claims of error in the admission of evidence at his trial. He contends, first, that the government's experts on sound and audiovisual recordings should not have been allowed to testify that possession of multiple copies of the same DVD or CD is indicative of an intent to sell them rather than keep them for personal use. Appellant argues that neither expert was qualified to testify on the indicia of sale and neither offered a sufficient methodological basis for their conclusions.

In view of Mr. Middleton's and Mr. Meyer's experience with pirated copies of CDs and DVDs, we are inclined to think that the judge did not abuse his discretion by permitting the challenged testimony.[30]

28. *See Belton v. United States*, 581 A.2d 1205, 1212 (D.C.1990) (excusing defendant's failure to object to judge's *ex parte* receipt of derogatory information about him, as "it would be expecting too much to hold a defendant accountable for failing, in effect, to accuse a judge of bias at the hearing just before the discretionary, virtually non-reviewable act of sentencing takes place"); *see also In re T.C.*, 999 A.2d 72, 79 n. 13 (D.C.2010) (acknowledging that "it would have been difficult to object to the judge's questioning when to do so would have risked irritating the person who was not only the trier of fact but also the individual who would be called upon to decide whether T.C., if found involved, would lose his freedom"). *But see In re D.M.*, 993 A.2d 535, 540 (D.C.2010) (observing that "plain error review would seem appropriate" where party had the opportunity "to express any concerns he may have had without attacking the judge's integrity"); *Outlaw v. United States*, 854 A.2d 169, 174 (D.C.2004) (distinguishing *Belton* as a case "where the defendant and his counsel were taken by surprise during the sentencing hearing by the judge's revelation, during a confrontational exchange between the judge and the allocuting defendant, that the judge had spoken personally about the defendant" with neighbors who complained he had been "making their lives miserable").

29. While at first blush it may seem surprising that a defendant would opt for the judge to continue presiding as trier of fact after the judge heard the defendant express a desire to plead guilty, it seems plausible to suppose that appellant was buoyed by the judge's initial vocal skepticism as to the evidentiary sufficiency of the government's case—a skepticism that seemingly touched off the derailment of the plea proceedings. The Seventh Circuit considered a similar situation in *United States v. Murphy*, 768 F.2d 1518 (7th Cir.1985). There, the prosecutor and the trial judge were close friends. Nonetheless, the defendant did not object to the judge's participation in the case. The court reasoned: "The defense camp elected not to make any further inquiry, perhaps believing that an ethical judge ... would bend over backward to avoid favoring the prosecutor in such a case and that the defense therefore had more to gain ... than it had to lose.... The defendant is bound by a tactical choice such as this may have been, whether or not he participated personally in that choice." *Id.* at 1540–41.

30. *See, e.g., Jones v. United States*, 990 A.2d 970, 979 (D.C.2010) (recognizing that professional experience may furnish a sufficient basis for expert testimony).

It is unnecessary to decide that question, however. Even if we were to assume that the testimony should not have been admitted, it is clear from the record that the trial judge did not rely on it. When Mr. Middleton's opinion was elicited, the judge interrupted him and observed that

> this isn't a point which [relates] to your expertise in sound recording technology and practices by the industry, is it? This is just a commonsense point you're making.... Why does it take an expert to say [these things]? ... If he's saying people don't walk around with five copies of the same CD because why would you ever do that if you weren't going to sell it, I mean, he can say that and we can evaluate it. I don't think it necessarily has anything to do with his expertise.

Although the judge made no similar comment during Mr. Meyer's testimony (perhaps because appellant did not renew his objection), he repeatedly instructed the prosecutor that he would not entertain expert testimony going to the ultimate issue. And when the judge later reviewed the evidence concerning appellant's intent, he did not mention the opinions of either expert. Instead, the judge reasoned that one can "infer from [the] circumstantial evidence beyond a reasonable doubt, reasonably and naturally" that appellant intended to sell the DVDs and CDs. The judge's words make it abundantly clear that even if there was an error, it was not substantial enough to require reversal.

■ Appellant's second evidentiary contention concerns the chain of custody of the 30 DVDs and 39 CDs admitted into evidence over his objection. Officer Janczyk testified that he took the backpack from appellant and gave it to his partner, who in his presence inventoried the contents on a PD-81 property receipt form and in the Fourth District Police Headquarters property book. As part of the inventory, the DVDs and CDs were counted, and the quantity of each was noted. The discs' individual titles were not recorded, however, nor did the police initial or otherwise mark or tag each disc for purposes of future identification. The evidence *en masse* was assigned a single property book number and put in a black bag, to which a corresponding property tag was affixed. (It is unclear from the record whether this black bag was the backpack seized from appellant.) The bag, which was not sealed shut, then was deposited in a locked mailbox for transfer to the Police Department's evidence control branch. Janczyk testified that he never lost sight of the evidence before it was put in this mailbox, to which only the property clerk had access. Janczyk next saw the bag on the day of trial, when he retrieved it, still bearing its property tag, from evidence control and brought it to court.[31] No witness at trial had personal knowledge of how the evidence had been handled in the interim. The bag's contents appeared to be unchanged, and Janczyk testified that he even recognized some of the DVDs by their titles. In response to the judge's questioning, though, Janczyk acknowledged that he had not memorized the titles of all the discs confiscated from appellant, and that the discs had no other markings from which he positively could identify them as the same ones he had seized.

■ Appellant objected to the admission of the DVDs and CDs, arguing that there was insufficient proof the items produced in court were the same as the

---

**31.** According to Janczyk, he retrieved the bag using a property control number assigned to it by the property clerk after he or she re- moved it from the locked mailbox at the Fourth District.

ones that were placed in the evidence bag on the day of his arrest. Although the trial judge found it surprising that the police had not marked the discs individually or recorded their individual titles, he overruled the objection on the ground that there was no evidence of tampering or any reason to doubt the integrity of the chain of custody. We review this ruling for abuse of discretion.[32] In doing so, we remain cognizant of the "broad discretion" that the trial court has in determining whether to admit physical evidence.[33]

■■■■■ It was the government's burden to prove that the discs offered into evidence at trial were the same ones the police seized from appellant.[34] In carrying that burden, the government has the benefit of an evidentiary presumption: "This court has stated that when physical evidence is in the hands of the government, the presumption arises that it has been handled properly."[35] Moreover, "once the government has established an unbroken chain of custody as a matter of reasonable probability, [the] defendant must present evidence" that the police tampered with or otherwise mishandled the evidence in order to succeed with his challenge.[36]

■■■■■ Appellant is correct that the chain of custody proof in this case was less than ideal. The failure of the police to mark each DVD and CD for identification, record the titles of the discs, or seal the evidence bag, combined with the dearth of testimony at trial about the evidence-handling procedures of the evidence control branch, understandably gave the trial judge pause. But the availability of "better practice[s]" is not a bar to the admission of the evidence.[37] Our cases make clear that the mere presence of purported irregularities in the chain of custody is not sufficient to show that the trial court abused its discretion by admitting the evidence. In *Fleming*, for example, two police officers gave inconsistent testimony regarding how drug evidence was handled, "thus suggesting a possible break in the chain," but in the absence of any evidence of tampering, ill will, or bad faith, we saw no reason to disturb the trial court's decision to admit the evidence.[38] In *Gilmore*, a police officer placed evidence of arson (a bottle) in a paint can. After writing the date and the address of the recovery site on the can, he put it in his evidence locker. The officer then forgot about the evidence and later believed he must have discarded it. Eight months later, after having informed the prosecutor he had destroyed the evidence, the officer found the can while cleaning out his locker. We held that although the officer's handling of the bottle was "plainly careless and not to be emulated," the evidence was still admissible, because the officer "was able to account for its whereabouts during the entire time period," and there was "no actual evidence that the bottle had been altered or misidentified."[39]

So, too, in the present case; there is no evidence that the police failed to maintain continuous custody over the DVDs and CDs seized from appellant, nor any evi-

---

**32.** See *Gilmore v. United States*, 742 A.2d 862, 871–72 (D.C.1999).

**33.** *Id.* at 871.

**34.** See *Fleming v. United States*, 923 A.2d 830, 836 (D.C.2007).

**35.** *In re D.S.*, 747 A.2d 1182, 1187 (D.C.2000).

**36.** *Id.* (internal quotation marks omitted); see also *Turney v. United States*, 626 A.2d 872, 874 (D.C.1993).

**37.** *Id.* at 874.

**38.** *Fleming*, 923 A.2d at 838.

**39.** *Gilmore*, 742 A.2d at 872.

dence of tampering or other mishandling. Appellant's chain of custody concerns therefore go not to the admissibility of the evidence, but instead to the weight that it could be given.[40] Hence the trial judge did not abuse his discretion in overruling appellant's objection and receiving the DVDs and CDs in evidence.

## IV.

 Appellant's final contention is that his convictions on two counts of deceptive labeling, one based on his possession of sound recordings and the other based on his possession of audiovisual works, should merge, because the Council of the District of Columbia did not intend to permit multiple convictions and punishments under D.C.Code § 22–3214.01 for possession of two kinds of deceptively labeled media at the same time and place. This claim poses a question of first impression for us, as to which our review is *de novo.*[41] As appellant recognizes, the issue is one of legislative intent.[42]

Appellant argues that our holding in *Briscoe v. United States*[43] is dispositive. The defendant in *Briscoe* was convicted of several drug offenses, including two counts of possession with intent to distribute ("PWID") marijuana. These two counts were for marijuana found by police during their execution of a search warrant at the defendant's apartment—one count related to marijuana discovered in the kitchen, and the other to marijuana found in the bedroom. We held that the two counts merged, primarily because "appellant's constructive possession [of the two different stashes of marijuana] occurred at the same time in his apartment," and "[t]he plain language of the statute indicates that the Council did not graduate the gravity of the crime" or "provide for distinctive penalties" on the basis of "the quantity of the controlled substance possessed" or the purity, packaging, or location of the stashes.[44]

As we subsequently observed, however, *Briscoe*'s holding is a narrow one: "That case stands for the unremarkable proposition that a defendant cannot be convicted of two counts of possession of a controlled substance with intent to distribute it when two quantities of the [same] controlled substance are found in the same place at the same time." [45] Where the two possessory counts pertain to *different* controlled substances, we have held that they do not merge, even though the same criminal statute is violated, "because the legislature intended to and did make the possession of each prohibited substance a separate of-

---

**40.** *See In re D.S.,* 747 A.2d at 1187.

**41.** *Hunter v. United States,* 980 A.2d 1158, 1162 (D.C.2009).

**42.** *See Whalen v. United States,* 445 U.S. 684, 688, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) ("[T]he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized.").

**43.** *Briscoe v. United States,* 528 A.2d 1243 (D.C.1987).

**44.** *Id.* at 1246. Thus, we reasoned, "it appears that the Council did not intend to au-

thorize multiple punishments under the facts of this case." *Id.* We also noted that the possessory offense in question was a continuing course of conduct (possession) rather than a discrete act (such as distribution), and that the Council "did not intend to protect different societal interests in prohibiting possession of marijuana with intent to distribute." *Id.*

**45.** *Allen v. United States,* 580 A.2d 653, 658–59 (D.C.1990) (holding that *Briscoe*'s rationale does not require merger of convictions for drug distribution and for PWID where "the distribution charge was based on conduct occurring a few moments before the possession with intent to distribute").

fense."[46] Indeed, in *Briscoe* itself, the appellant was convicted of three other PWID counts, each one based on a different drug (cocaine, heroin, and phencyclidine) found along with the marijuana in the search of his apartment, and these three counts did not merge. Thus, while *Briscoe* would support appellant's merger argument in the present case if both counts of conviction had involved the same class of media protected by the deceptive labeling statute (i.e., either sound recordings (CDs) or audiovisual works (DVDs) in both counts), that was not so. The two counts related to appellant's possession of two different classes of protected media. If anything, *Briscoe* suggests that, for that reason, the two counts do not merge.

 On the other hand, multiple convictions for simultaneous violations of the same statute are not necessarily permissible simply because each conviction involves a different prohibited instrumentality or object. In *Bean v. United States*,[47] we examined convictions under former D.C.Code § 22–3204, which made it a crime to carry either "a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed."[48] The defendant in *Bean* was convicted of two counts of carrying a dangerous weapon: a rifle in the first count and a knife in the second. We held that the convictions merged because "nothing in the relevant language of the statute" indicated that the legislature meant to allow multiple convictions for carrying different concealable dangerous weapons at the same time.[49]

There is an important difference, however, between the statute we considered in *Bean* and the deceptive labeling statute before us now. Unlike § 22–3204 (and its current incarnation, § 22–4505(a)), which drew no distinction between different types of deadly and dangerous weapons, the deceptive labeling statute explicitly treats audiovisual works as different from sound recordings. The statute provides that any person found guilty of deceptive labeling involving fewer than 1,000 sound recordings or fewer than 100 audiovisual works during any 180–day period has committed a misdemeanor punishable by imprisonment for up to one year and a fine of up to $10,000; while if the offense involves 1,000 or more sound recordings or 100 or more audiovisual works, it is a felony punishable by up to five years in prison and a fine of up to $50,000.[50] So whether the offense involves CDs or DVDs can make a very big difference. To illustrate, deceptive labeling of 500 CDs is only a misdemeanor, while deceptive labeling of one-fifth as many DVDs is a felony. Moreover, there is no interchangeability—1,000 CDs makes the offense a felony, but 950

46. *Corbin v. United States*, 481 A.2d 1301, 1302 (D.C.1984) (holding that separate counts of conviction for simultaneous possession of marijuana and phencyclidine do not merge).

47. 576 A.2d 187 (D.C.1990).

48. D.C.Code § 22–3204 (1989). The current concealed weapons statute is codified at D.C.Code § 22–4504(a) (2001).

49. *Bean*, 576 A.2d at 190. The court relied, in part, on *Cormier v. United States*, 137 A.2d 212 (D.C.1957), which held that a defendant carrying two unlicensed pistols was guilty of only one violation of § 22–3204. To our knowledge, we have not had occasion to decide whether two separate convictions under the concealed weapon statute, one for carrying a pistol without a license (in violation of the statute's first prong) and the other for simultaneously carrying a deadly or dangerous weapon capable of being concealed on or about the person (in violation of the statute's second prong), would merge. We do not read *Bean* and *Cormier* to require or suggest that they would merge.

50. D.C.Code § 22–3214.01(d) (2001).

CDs and 50 DVDs do not combine to create a felony. By thus differentiating between sound recordings and audiovisual works for purposes of determining the gravity of the offense and level of punishment, the Council manifested an intent to treat deceptive labeling of the two categories of media as distinct offenses—implying that the offenses are charged, properly, in different counts that do not merge.

The legislative history of D.C.Code § 22–3214.01 does not suggest otherwise. The deceptive labeling law was enacted as part of D.C. Law 11–73, the Commercial Piracy Protection and Deceptive Labeling Amendment Act of 1995 (the "1995 Act").[51] The Judiciary Committee report on the legislation reveals that the deceptive labeling statute was motivated by two distinct concerns, one relating to audiovisual works and the other relating to sound recordings, that happened to coincide. First, the Council was concerned by the burgeoning epidemic of video piracy, which no existing law in the District addressed, and it perceived a deceptive labeling law as the best way to attack the problem and protect audiovisual works in local law.[52] Second, the legislators were concerned that the existing commercial piracy statute (which covered sound recordings only) was preempted by federal law.[53] To address that separate concern, the 1995 Act amended the commercial piracy statute, former D.C.Code § 22–3814 (1981), by limiting it to sound recordings "initially fixed" before February 15, 1972.[54] This decision made it necessary to include sound recordings along with audiovisual works in the new deceptive labeling statute (which was not preempted)—not because the legislators saw sound recordings and audiovisual works as equivalent, but because otherwise sound recordings fixed on or after February 15, 1972, would have no protection under local law. Thus, the joinder of audiovisual works and sound recordings in the deceptive labeling statute was only a marriage of convenience and not, given the differentiation between the two media in the statute's penalty structure, a marriage of equals.

After considering both the plain language of the deceptive labeling statute and its history, we readily conclude that the two counts on which appellant was convicted do not merge.

---

51. 42 D.C.Reg. 3277 (1995).

52. *See* Council of the District of Columbia, Comm. on the Judiciary, Report on Bill 11–125, "Commercial Piracy and Deceptive Labeling Amendment Act of 1995" at 1–2 (April 19, 1995) ("Film and video piracy costs the motion picture industry an estimated $2 billion annually in lost revenues worldwide. . . . Ultimately, consumers bear the brunt of piracy in higher retail costs and inferior merchandise, as pirated video[s] are rarely of the same high quality as those professionally manufactured from master tapes. It is a violation of federal copyright law to sell or distribute pirated videos. However, to combat video piracy on the local level, many states have adopted 'truth-in-labeling' laws and other statutes that can be effectively used to prosecute film and video piracy.").

53. *See id.* at 5 (explaining that the commercial piracy statute "provides penalties only for the unauthorized copying of sound recordings and there is a question[ ] as to whether federal copyright law would preempt this section for recordings made after 1972"); 17 U.S.C. § 301(a) (2006) (providing for federal Copyright Act preemption of state law).

54. *See id.* § 301(c) (providing exception to preemption provisions "[w]ith respect to sound recordings fixed before February 15, 1972"). As amended, the commercial piracy statute is now codified as D.C.Code § 22–3214 (2001), and subsection (e) provides that it "does not apply to any sound recording initially fixed on or after February 15, 1972." The statute still does not apply to audiovisual works.

## V.

For the foregoing reasons, we affirm appellant's convictions.

*So ordered.*