*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-1433

MICHAEL WONSON, APPELLANT

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(FEL-7080-00)

(Hon. Thomas J. Motley, Trial Judge)

(Argued October 6, 2015                       Decided April 14, 2016)
(Amended July 21, 2016)[*]

*Deborah A. Persico* for appellant. *Joseph Virgilio* was on the brief for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Emory V. Cole*, and *Opher Shweiki*, Assistant United States Attorneys, were on brief, for appellee.

---

[*] In response to Mr. Wonson's petition for rehearing or rehearing en banc, this opinion is amended to replace the second paragraph of Section III with a new paragraph.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and REID, *Senior Judge*.

Opinion for the court per curiam.

Concurring opinion by *Associate Judge* EASTERLY at page 21.

PER CURIAM: Michael Wonson asks us to reverse his two murder convictions because the government failed to present evidence that it maintained custody over the ballistics evidence (multiple cartridge cases and one live round) admitted at trial. Although a crime-scene search technician testified that he collected these items at the scene, and a firearms and toolmark examiner testified that he examined these items, the government never explained how the items made their way from the former to the latter. Instead, the technician who collected the cartridge cases and the live round testified that he gave them to a supervisor who was later fired for mishandling and mislabeling evidence. And the firearms and toolmark examiner did not explain how or when he obtained the ballistics material he examined. In particular, he did not elaborate on a notation in his report indicating that this material had been "personally delivered" (to whom, the report did not specify) by a different crime scene technician who did not testify at trial.

We do not determine whether the proffered evidence should have been excluded because the admission of this evidence was harmless. The cartridge

cases and the live round were only a peripheral part of the government's case against Mr. Wonson.  Unpersuaded by Mr. Wonson's remaining arguments,[1] we affirm his convictions.

## I.      Background and Procedural History

A little before midnight on May 17, 2000, two men in a black pickup truck drove up to Eastern Senior High School in Washington, D.C., where more than a dozen people were socializing.  The men shot into the crowd, injuring Nakita Sweeney and killing both Charles Jackson and Ivory Harrison.  A week later, Ronald Brisbon was arrested and gave a videotaped confession in which he admitted to participating in the shooting with another man, whom he identified by a nickname.  After further investigation, including interviews with Dana Route, Mr. Brisbon's former girlfriend, and with Michael Cobb, the man who sold Mr. Brisbon a black pickup truck one day before the shooting, the government identified Michael Wonson as the second shooter.

---

[1]  In addition to attacking the admissibility of this evidence, Mr. Wonson argues that reversal is required because the government failed to meet its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), because his Sixth Amendment right to confrontation was violated, and because the government engaged in misconduct during its closing argument.

The government charged both Ronald Brisbon and Michael Wonson with (1) two counts of first-degree murder while armed,[2] (2) one count of assault with intent to kill while armed,[3] (3) three counts of possession of a firearm during a crime of violence,[4] and (4) one count of felony destruction of property.[5] After a joint trial in 2002, a jury convicted both men on all counts, but this court reversed Mr. Wonson's convictions on appeal.[6] *See Brisbon v. United States*, 957 A.2d 931, 940, 957, 959 (D.C. 2008). The government reprosecuted Mr. Wonson in 2011 but that trial resulted in a hung jury. The government then prosecuted Mr. Wonson a third time in 2012.

---

[2] D.C. Code §§ 22-2401 (2000 Supp.), -2404.1 (b)(6) (2000 Supp.), -3202 (1996 Repl.).

[3] D.C. Code §§ 22-501, -3202 (1996 Repl.).

[4] D.C. Code § 22-3204 (b) (1996 Repl.).

[5] D.C. Code § 22-403 (1996 Repl.).

[6] This court held that the trial court erred by admitting at a joint trial Mr. Brisbon's unredacted videotaped confession, which incriminated Mr. Wonson. *See Brisbon v. United States*, 957 A.2d 931, 953-57 (D.C. 2008). We determined that this error was not harmless because the government's remaining evidence against Mr. Wonson at the 2002 trial was "largely circumstantial." *Id*. at 956.

At the 2012 trial, the government called Mr. Brisbon as a witness,[7] and he gave a detailed account of Mr. Wonson's motive for and participation in the shooting. In particular, Mr. Brisbon recounted that Mr. Wonson's gun had jammed and that, to clear the jam, Mr. Wonson had removed a live round of ammunition. Ms. Route and Mr. Cobb corroborated Mr. Brisbon's testimony regarding Mr. Wonson's actions prior and subsequent to the shooting.[8] The government also presented testimony from several other witnesses, including Metropolitan Police Department crime-scene search technician Karl Turner[9] and firearms examiner Michael Mulderig. Lastly, the government presented physical evidence to the jury: one live round of ammunition and forty-three empty cartridge cases.

At the conclusion of trial, the jury convicted Mr. Wonson on all counts, and the judge sentenced him to seventy years to life imprisonment, with a mandatory minimum of sixty years imprisonment. This appeal followed.

---

[7] Mr. Brisbon had also testified for the government at the 2011 trial.

[8] Ms. Route and Mr. Cobb had both previously testified for the government at the 2002 and 2011 trials.

[9] Due to illness, Mr. Turner was deemed unavailable at the 2012 trial. His testimony from the 2011 trial was read aloud to the jury, and defense counsel's objections from the 2011 proceeding were incorporated into the record.

## II.     Admission of the Ballistics Evidence

Mr. Wonson argues that the trial court erred by admitting the proffered ballistics material because the government failed to establish an unbroken chain of custody.  We review the trial court's admission of physical evidence for abuse of discretion.  *See Plummer v. United States*, 43 A.3d 260, 272 (D.C. 2012).  In order to reverse, however, we must conclude that any abuse of discretion was not harmless.  *See Travers v. United States*, 124 A.3d 634, 638-41 (D.C. 2015).

### A.     Facts

The ballistics material was admitted over repeated objection during Mr. Turner's testimony.  Mr. Turner testified that he responded to the scene shortly after the shooting with "lead technician" Ricky Hammett and another colleague.  Their attention was directed to "shell casings . . . that had been strewn throughout the street which needed to be recovered in reference to a shooting that had occurred at that location."  According to Mr. Turner, he and his colleagues remained at the scene collecting evidence for about eight or nine hours.

During Mr. Turner's testimony, the government asked him to examine two bags marked as Exhibits 1 and 2.[10] Mr. Turner identified the bags by the numbers written on them in magic marker, though he noted that the writing on the first bag was "faded" and "not very legible." He also confirmed that the material inside the bags[11] was "a fair and accurate representation" of what he "remembered to be collected . . . from the scene."

As soon as he did so, the government moved to admit these two exhibits into evidence. Defense counsel objected, however, noting that there was "a hole in the bag" marked as Exhibit 1. Without disagreement from the government, counsel represented that the hole was big enough for a bullet to fit through. She expressed concern about "the one round that they're saying is the misfired bullet" because

---

[10] Even before this point, defense counsel had flagged the admissibility of the ballistics material as an issue. The trial court observed that it "need[ed] to hear the testimony about where it's kept, how it's kept, all sorts of things in order to make that determination . . . . [T]hey need to make an attempt to get it in for me to make that determination. I don't know anything now. . . . I have to listen to evidence and say [whether] that's satisfactory . . . ."

[11] Mr. Turner testified that the bag marked as Exhibit 1 contained a live round but he was never asked to identify the contents of Exhibit 2.

"there was a hole in the bag and they placed the piece of tape on top of it."[12]  The

court sustained defense counsel's objection to the admission of these exhibits,

noting that the government had not yet presented sufficient information about

"how these things are maintained over an 11-year period of time" and that it

"need[ed] that necessarily in order . . . to make the final determination."

With some prompting from the court,[13] the government asked Mr. Turner to

explain how he and his colleagues collected the ballistics material discovered at the

scene.[14]  Mr. Turner explained that they placed the items they recovered in plastic

bags numbered one through forty-four, and that he helped diagram the location of

each item and held the bags as the other officers "picked the items up and placed

---

[12]  Counsel acknowledged that this exhibit had been admitted "in the first trial," when Mr. Wonson was represented by a different attorney, and that "there was no objection to it or . . . concern about its foundation at that point."

[13]  In its questioning, the government jumped from trying to establish that Mr. Turner could identify all the items marked as exhibits as items he saw at the scene, to asking how these items were eventually stored, prompting the court to inquire, "[I]s there a step before?  How do you recover it?  Shouldn't that be the first step, counsel? . . . .  Let's get to that."

[14]  The government did not seem to think that it needed to present this testimony, protesting to the court that it had, in its view, already "established more than enough of a basis for [exhibit] number one to currently be admitted."  The court responded by informing the government that it could lay a proper foundation "or  . . . not" for the admission of its evidence, but it would "[p]roceed at [its] own risk."

them in the bag[s]." According to Mr. Turner, these bags were put in one larger bag. The bagged items were then "turned over to the lead technician," Mr. Hammett, who, according to Mr. Turner, took them back to his "office," i.e., the "mobile crime lab."

Having presented this additional testimony, the government again requested admission of Exhibits 1 and 2, as well as Exhibits 3 through 44, over defense counsel's objection. Out of the presence of the jury, the court again refused to admit the evidence, observing, "I'm at the office [the mobile crime lab] now, I've got 11 years to [ac]count for. You're trying to get the evidence in at trial today."

The government then raised two issues related to defense counsel's cross-examination of Mr. Turner. The first issue was the hole in the bag marked as Exhibit 1. The government sought to preclude cross-examination of Mr. Turner about the hole because he had "no self-knowledge of that particular item."[15] The

---

[15] The government proffered that, at an unspecified time, another individual, identified as Officer Slaughter, had placed the tape over the hole in the bag "so that the bullet wouldn't fall out," and that Mr. Turner "wasn't there, didn't do it." But the government never called Officer Slaughter to testify.

court declined this request and Mr. Turner subsequently testified on cross-examination that he had "no idea how the hole got there."

The second issue was Mr. Hammett's termination for mishandling and mislabeling evidence and the fact that the government had opted not to call him to testify.[16] The government sought to limit cross-examination of Mr. Turner on this subject too. Again the court declined to grant the government's request. The court observed that the government had "cho[]se[n] not to call [Mr. Hammett] because if [he] was here testifying," defense counsel "could ask him questions about the fact that he had misappropriate[d]—he had in essence mislabeled matters and had discipline for that." The court rejected the government's argument that Mr. Hammett's misconduct was irrelevant, explaining that Mr. Hammett had not gotten in trouble for "drunk driving . . . or some other issue. This witness got in trouble with regard to the same issue here and that's the preservation . . . of evidence."

---

[16] The government had notified defense counsel prior to the 2011 trial that Mr. Hammett had been terminated in 2005 "for neglect of duty." According to the government, "[o]n several occasions between 2003 and 2004, Officer Hammett failed to comply with proper procedures for labeling and handling evidence, making it impossible in some cases to determine what evidence related to a particular investigation." Although Mr. Hammett had since been "reinstated" by the MPD, the government had informed counsel that it "d[id] not intend to call Officer Hammett as a witness at trial."

Returning to its examination of Mr. Turner, the government established that Mr. Turner's personal knowledge of the custody and control of the ballistics material ended when Mr. Hammett "took this evidence to the mobile crime lab from the . . . crime scene." Mr. Turner explained that he was not "aware of what happened to the evidence" because he "wasn't part of his—him [Mr. Hammett] processing the evidence."

Nonetheless, the government asked Mr. Turner to testify "as a general matter" about what happens to evidence brought to the mobile crime lab. Mr. Turner explained that it should be "tagged, marked, placed on a mobile crime property book[,] and it is determined where it needs to go[,] if it needs to go to a lab or . . . to the firearms examination section." Logging evidence in the property book, Mr. Turner explained, is meant to "catalog the evidence that's collected [at] the scene so it can be tracked at a later date if necessary."

Mr. Turner also testified "as a general matter" about what happens after evidence "is processed," explaining that "it's sent to the property division," where it is "stored until it's recalled." Because he did not work for the property division, Mr. Turner could not testify "intelligently" about "property storage" procedures;

"all [he] kn[e]w" was that "we send it to them and they store it until it's recalled . . . at a later date." He testified that the evidence in Mr. Wonson's case had been transported from the property division to the courthouse, later qualifying, "[a]s far as my knowledge it was." Finally he testified that there were no irregularities with the government's Exhibits 1-44 "to [his] knowledge."

At this point the trial court asked defense counsel to "put on [the] record [her] objections" to the admission of these exhibits. Defense counsel argued that Mr. Turner did not "have personal knowledge of the evidence and how it's been stored in any way, shape or form from the time it was collected," that he did not "have personal knowledge that the evidence that he has in that bag is the exact same evidence that was recovered from that scene," and thus that the "[g]overnment hasn't established in any way, shape or form [that] the chain of custody has been maintained."

The court acknowledged that in order to admit these items, it had to determine that the proffered evidence "is what it is claimed to be," i.e., bullets

recovered from the crime scene.[17]  The court also acknowledged that it had to determine that this material was in "the same or substantially the same condition as it was at the time it was recovered from the [crime] scene."  Noting, however, that it could "take into consideration that the property was stored in a police property office," and that "the presumption here" is that this office "preserve[s] the property," the court concluded that Exhibits 1-44 "are what they purport to be, ballistics evidence recovered from the scene."  Thus, the court ruled that it would "permit those exhibits to come into evidence" over defense counsel's objection.

After the court ruled, the government called Mr. Mulderig, who had examined the cartridge cases and live bullet admitted as Exhibits 1-44.[18]  Mr. Mulderig testified that when he conducted his examination, he engraved Exhibits 1-44 with his initials and a lab number.  He then identified his engravings at trial. But Mr. Mulderig could not say precisely when he conducted the examination; he

---

[17]  The only authority the trial court invoked was the federal rule on authenticity, Federal Rule of Evidence 901, but this court has not adopted that rule. *See Stewart v. United States*, 881 A.2d 1100, 1111 (D.C. 2005).

[18]  Mr. Mulderig was an MPD employee at the time he conducted his examination of the bullets; by the time of the 2012 trial, he had retired but was still "doing the same work" for the MPD as an independent contractor.

only knew that it was "[a]pproximately June of 2000."[19]   And the government never asked him how or when he received the bullets.   When defense counsel asked Mr. Mulderig whether he knew "where the evidence was in between the time of the incident and the time it arrived at your office," he responded, "[n]o, I don't."[20]   Lastly, Mr. Mulderig could not explain the origin of the hole in the bag containing the live cartridge. When defense counsel asked him to confirm that the bag did not have a hole at the time of his examination, he could not do so.   Instead he stated that he did not remember.

## B.     Analysis

Without deciding whether the trial court abused its discretion by admitting the ballistics material in this case, we conclude that Mr. Wonson is not entitled to reversal because the court's ruling was harmless.   When a trial court makes a non-constitutional error, we will nonetheless affirm the conviction if we can say, "with fair assurance, after pondering all that happened without stripping the erroneous

---

[19]   Mr. Mulderig's report, which was admitted into evidence, is dated June 9, 2000, a little more than three weeks after the shooting.

[20]   Mr. Mulderig's report provides a snippet of information: it contains a notation that what became Exhibits 1-44 "were personally delivered on May 18, 2000 by Technician Elizabeth Sharp-Hamlet."   The government did not ask Mr. Mulderig any questions about this notation.

action from the whole, that the judgment was not substantially swayed by the error." *Robinson v. United States*, 50 A.3d 508, 528 (D.C. 2012) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). We examine the error "in relation to all else that happened" at trial, *Kotteakos*, 328 U.S. at 764, to discern "the likely impact of the . . . error on the jury's verdict," *Robinson*, 50 A.3d at 528. If "the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Smith v. United States*, 26 A.3d 248, 264 (D.C. 2011) (quoting *Kotteakos*, 328 U.S. at 764). In this case, we conclude that the jury's consideration of the ballistics evidence did not "substantially sway[]" its verdict. *See Kotteakos*, 328 U.S. at 765.[21]

To begin, the ballistics material did not directly link Mr. Wonson to the shooting. Although the police found ammunition in Mr. Wonson's truck, it was not the same brand of ammunition found at the scene. And although the police

---

[21] Mr. Wonson does not argue on appeal that Mr. Mulderig's testimony should have been struck or that the admission of his testimony affected the verdict in any way, but even if he had done so, our harmlessness analysis would remain unchanged.

used an examination of toolmarks on the recovered casings to match them to a gun, the government presented no evidence to connect the gun to Mr. Wonson.[22]

Instead, the ballistics material played a subtler and less central role at trial: the government used it to corroborate Mr. Brisbon's account of the shooting as a two-man operation and his identification of Mr. Wonson as his accomplice. These items corroborated Mr. Brisbon's testimony because they (1) consisted of two types of cartridge cases, suggesting that the shooting involved two guns and two shooters, as Mr. Brisbon testified; and (2) included one live cartridge, supporting Mr. Brisbon's narrative that Mr. Wonson's gun had jammed and that Mr. Wonson had removed and discarded a live round at the scene of the shooting.

Any benefit to the government from this corroboration was slight, however, given the other evidence presented to the jury. First, Mr. Brisbon's 2012 testimony that this was a two-man operation was corroborated by his own prior consistent statements. Indeed, as the jury heard, when the police arrested Mr. Brisbon a week after the shooting, he told them that he had committed the murders with a second

---

[22] In fact, the government stipulated that the gun had been used in another crime at a time when Mr. Wonson could not have had access to it.

man.[23]  Moreover, two witnesses corroborated Mr. Brisbon's 2012 testimony that the second shooter was Mr. Wonson.  Michael Cobb testified—consistent with his statement to the police in June 2000—that a "short dude" with dreadlocks, whom Mr. Cobb later identified as Mr. Wonson, was present when Mr. Cobb sold the black truck to Mr. Brisbon.   And Dana Route testified—as she testified before the grand jury in June 2000—that Mr. Brisbon and Mr. Wonson were together immediately before the murders and immediately afterward and that both were armed.  This congruent testimony was powerful evidence against Mr. Wonson.[24]  Tellingly, the government chose to highlight it in closing argument and did not mention that two types of cartridge casings were found at the scene.

---

[23]  The government also introduced an August 2000 letter from Mr. Brisbon to Ms. Route's mother in which Mr. Brisbon acknowledged that he had committed the shooting with another man, although he claimed that he had falsely implicated Mr. Wonson in his statement to the police, because he "could not tell on my mans," i.e., his true accomplice: "that's why I put myself and another dude [referring to Mr. Wonson] that didn't know shit about me or this situation in it."

[24]  Indeed, as an apparent concession to its force, the defense tried to argue that Mr. Brisbon had directed Ms. Route and Mr. Cobb to falsely implicate Mr. Wonson to protect Mr. Brisbon's real accomplice.  We need not assess the plausibility of this argument because the ballistics evidence did not impact it one way or another.  Insofar as the ballistics evidence corroborated that this was a two-person operation, it was consistent with the defense theory.

The admission of the live round likewise had minimal force when placed in the context of Mr. Wonson's trial. Although it meshed with Mr. Brisbon's narrative that Mr. Wonson's gun had jammed, it was not the only evidence corroborating this detail; Ms. Route testified that "[w]hen Michael Wonson and Mr. Brisbon came back into the house with the two rifles, Mr. Brisbon said to Michael Wonson, 'I can't believe the gun jammed.'" Moreover, Mr. Turner specifically recalled collecting a live round from the scene of the shooting. Lastly, although the government mentioned in closing that a jammed gun might explain the live cartridge recovered from the scene, this was a peripheral observation. The government's central focus was on the testimony from Mr. Brisbon, Ms. Route, and Mr. Cobb, not the ballistics material.

For all of these reasons and in the absence of any evidence indicating that the jury attached particular significance to the cartridge or cartridge cases as it deliberated, we conclude that admission of the ballistics material at Mr. Wonson's trial does not require reversal.

## III. Remaining Arguments

We are unpersuaded by Mr. Wonson's three remaining arguments. First, he argues that "a remand is necessary for the government to provide the full OIA [Office of Internal Affairs] investigation report concerning Officer Hammett," to determine if the government fulfilled its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). But assuming that the government should have disclosed the full report (instead of a mere summary) to the defense prior to trial, Mr. Wonson has no *Brady* claim on appeal. Our conclusion, with the benefit of hindsight, that the admission of the bullet evidence was harmless, likewise compels a conclusion that this report would not have satisfied the materiality component of a successful *Brady* claim.[25]

Second, Mr. Wonson argues that trial court violated the Sixth Amendment's Confrontation Clause by admitting "evidence that [Ronald] Brisbon

---

[25] This conclusion has no bearing on the government's disclosure obligations pretrial. *See Vaughn v. United States*, 93 A.3d 1237, 1262 n.29 (D.C. 2014) ("The materiality assessment this court conducts on appellate review is necessarily different from the materiality assessment the government can make pretrial when assessing its *Brady* obligations, and we reiterate that prior to trial, the government must disclose information that is 'arguably' material."); *Boyd v. United States*, 908 A.2d 39, 60 (D.C. 2006) (explaining that a "broad" "duty of disclosure exists even when the items disclosed later prove not to be material").

was convicted by another jury." The trial court did not admit any written judgment of conviction or sentence; Mr. Wonson complains only that Mr. Brisbon "testified . . . that he had been convicted by a jury."[26] Mr. Wonson waived any Confrontation Clause claim by failing to object to the admission of Mr. Brisbon's testimony on direct examination,[27] and then repeatedly eliciting testimony on cross-examination related to Mr. Brisbon's conviction and sentence. *See Sobin v. District of Columbia*, 494 A.2d 1272, 1275 (D.C. 1985) ("When a defendant fails to object to the admission of certain testimony, and then further develops that

---

[26] When the prosecutor asked Mr. Brisbon what happened at his trial in January 2002, Mr. Brisbon responded, "I got found guilty."

[27] Because, with the exception of admitting Mr. Turner's testimony from the 2011 trial, the court made clear that the lawyers were trying the case anew, directing counsel to "[p]retend I'm a new judge," we do not consider any objections from Mr. Wonson's mistrial in 2011. *Compare United States v. Akers*, 702 F.2d 1145, 1147-48 (D.C. Cir. 1983) ("When . . . the previous trial is a nullity, the court in the new trial tries the case as if it were being tried for the first time, as if there had been no prior trial.") (internal quotation marks omitted), *with Williams v. United States*, 858 A.2d 978, 981 n.7 (D.C. 2004) (explaining that, where "it was understood from the beginning of the new trial that the judge was adopting the evidentiary rulings made in the prior trial," "the trial court's general adoption of its prior rulings and [the defendant's] prior notice to adopt the motions of his co-defendants was sufficient to preserve [the defendant's] objection").

As for the trial we are now reviewing on appeal, Mr. Wonson's counsel never raised an objection under the Confrontation Clause. U.S. CONST. amend. VI. Rather the record reflects only that the court and counsel discussed how to refer to Mr. Brisbon's and Mr. Wonson's joint 2002 trial in a way that would not reveal that Mr. Wonson had been "convicted at a prior occasion."

testimony on cross-examination, he will not be heard to argue on appeal that its admission constituted reversible error.").[28]

Finally, Mr. Wonson argues that the prosecutor's closing argument was "inflammatory" and violated the Fifth Amendment's Due Process Clause. In particular, he complains that the prosecutor "repeatedly mention[ed] the length of time it had been between the time the victims were killed and the 2012 trial," and that the prosecutor "juxtaposed that argument with repeated comments that justice had come to Brisbon in 2002." Because Mr. Wonson never objected to these comments, we review for plain error. Even assuming error that is plain, the prosecutor's argument, while melodramatic, did not "so clearly prejudice[]" Mr. Wonson's rights "as to jeopardize the fairness and integrity of his trial." *Burgess v. United States*, 786 A.2d 561, 570 (D.C. 2001) (quoting *Irick v. United States*, 565 A.2d 26, 32 (D.C. 1989)).

---

[28] Because we conclude that Mr. Wonson waived his argument that admission of Mr. Brisbon's testimony somehow violated the Confrontation Clause, we do not decide whether, as Mr. Wonson argues, "the trial court was required to give a proper cautionary instruction, *sua sponte*, to prevent substantial prejudice" arising from such a violation. We note, however, that the court specifically instructed the jury not to consider Mr. Brisbon's convictions as evidence of Mr. Wonson's guilt.

## IV.   Conclusion

For the foregoing reasons, we affirm Mr. Wonson's convictions.

*So ordered.*

EASTERLY, *Associate Judge*, concurring:   The majority opinion does not decide whether the trial court abused its discretion in admitting the proffered ballistics material and relies on a harmless error analysis to resolve that challenge to Mr. Wonson's convictions.   It is clear, however, that the government did not provide the trial court with the requisite foundation to admit this ballistics material. That the government repeatedly sought admission of this evidence in the absence of adequate foundation, and ultimately succeeded, reveals a need to review the admissibility requirements for tangible items that the government proffers as inculpating a defendant in the commission of a crime.

"It is generally recognized that tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense."   (*Dawayne*) *Brooks v. United States*, 717 A.2d 323, 328 (D.C. 1998) (quoting *Gass v. United*

*States*, 416 F.2d 767, 770 n.8 (D.C. Cir. 1969)); *see generally* 2 MCCORMICK ON EVIDENCE § 213 (7th ed. 2013) [hereinafter 2 MCCORMICK ON EVID. § 213] (providing background on chain of custody). A trial court has "broad discretion" when deciding whether to admit physical evidence. *Plummer*, 43 A.3d at 272. But before a court may admit tangible items proffered by the government, the government must address two related concerns.

First, the government must establish that the objects are genuine—i.e., that the proffered evidence is what the government says it is.[1] *See Plummer*, 43 A.3d at 272 (stating that to establish admissibility, the government must prove that objects "offered into evidence at trial were the same ones the police seized from appellant"); *see also Turney v. United States*, 626 A.2d 872, 873 (D.C. 1993) (explaining that, to move into evidence fungible objects, such as illegal drugs, the government must prove that the objects are the same as those seized from the

---

[1] Demonstrating that an object is what a party says it is may also be referred to as establishing "authenticity," but that term can also have broader meaning. *See* 2 MCCORMICK ON EVID. § 213 (explaining that "authentication" of non-unique crime scene evidence may require proof both that it was found at the crime scene and that the object "has neither been exchanged nor altered" "from the moment it was found to its appearance in the courtroom"). Moreover, "authenticity" risks confusion with Federal Rule of Evidence 901, which this court has not adopted. *See supra* note 17.

defendant); *accord Fleming v. United States*, 923 A.2d 830, 836 (D.C. 2007); *Stewart v. United States*, 881 A.2d 1100, 1115 (D.C. 2005).

Second, the government must establish the integrity of the evidence—i.e., that the evidence has not changed in material ways. *See Ford v. United States*, 396 A.2d 191, 194 (D.C. 1978) (a trial court "must be satisfied" that an article the government seeks to move into evidence "has not been changed in important aspects" (quoting *United States v. S.B. Penick & Co*., 136 F.2d 413, 415 (2d Cir. 1943))); *accord Fleming*, 923 A.2d at 836; *Gilmore v. United States*, 742 A.2d 862, 871 (D.C. 1999). "This determination is made in light of the 'nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it.'" *Gilmore*, 742 A.2d at 871 (quoting *Ford*, 396 A.2d at 194).

The government may satisfy these dual concerns by establishing an unbroken chain of custody. Once it does so, courts afford the government the benefit of "an evidentiary presumption" that it properly handles and suitably preserves the evidence over which it maintains continuous custody and control. *Plummer*, 43 A.3d at 272 ("[W]hen physical evidence is in the hands of the government, the presumption arises that it has been handled properly." (quoting *In*

*re D.S.*, 747 A.2d 1182, 1187 (D.C. 2000))); *Brooks*, 717 A.2d at 328 ("[W]hen the item has been in the possession of government officials charged with its keeping, the court may assume . . . that the officials properly discharged their duties." (quoting *Ford*, 396 A.2d at 194)).[2] At this point, the burden shifts to the defendant to rebut the presumption by showing that the evidence was not genuine or that its integrity was somehow compromised. *See Fleming*, 923 A.2d at 837 (citing *Turney*, 626 A.2d at 874, and *Gilmore*, 742 A.2d at 871); *Ford*, 396 A.2d at 195.

To gain the benefit of this presumption and its burden-shifting framework, the government must establish an unbroken chain of custody by a "reasonable probability." *Plummer*, 43 A.3d at 272. Absent proof by a reasonable probability that challenged evidence was in the government's continuous custody and control, the trial court generally must exclude the proffered evidence.[3] *See Turney*, 626 A.2d at 874-75 (citing cases in which courts determined that "the chain of custody

---

[2] *See also* 2 McCORMICK ON EVID. § 213 (explaining that to establish the admissibility of physical evidence, the proponent typically "traces the chain of custody of the item from the moment it was found to its appearance in the courtroom, with sufficient completeness to render it reasonably probable that the original item has neither been exchanged nor altered").

[3] As a practical matter, the government's inability to demonstrate an unbroken chain of custody by a reasonable probability may result in the exclusion of its proffered evidence. But the government may still seek to establish the genuineness and integrity of the evidence directly. *See infra* note 9.

[was] insufficiently proved" and consequently that the proffered objects should not have been admitted into evidence); *Novak v. District of Columbia*, 160 F.2d 588, 589 (D.C. Cir. 1947) (reversing conviction because the evidence was "missing a *necessary* link in the chain of identification" (footnote omitted) (emphasis added)).[4] *Cf. United States v. Mejia*, 597 F.3d 1329, 1336 (D.C. Cir. 2010) ("A break in the chain of custody . . . can be serious enough that the [trial] court may abuse its discretion in admitting the evidence.").

In its brief to this court, the government argues that a break in the chain of custody affects "only" the weight of the evidence, not its admissibility. This is incorrect. It is true that, "normally," the government establishes a chain of custody by a reasonable probability, and whatever imperfections remain "go to the weight of the evidence rather than its admissibility." (*Herbert*) *Brooks v. United States*, 993 A.2d 1090, 1094 (D.C. 2010) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009)). After all, the government may be able to prove an unbroken chain of custody by a reasonable probability but unable to satisfy a higher standard of proof. Thus, in *Plummer*, this court explained that, because the government had presented sufficient evidence that it had maintained continuous

---

[4] *Novak* is binding on this court. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

custody and control over the physical evidence in question, "[a]ppellant's chain of custody concerns *therefore* go not to the admissibility of the evidence, but instead to the weight that it could be given." 43 A.3d at 273 (emphasis added). The clear implication of *Plummer*—which aligns with the other decisions binding on this court discussed above and with the MPD's understanding of the import of chain of custody[5]—is that a failure to present sufficient evidence of chain of custody can implicate admissibility. [6] Indeed, if the government were correct and breaks in the

---

[5] In its general order addressing the collection of physical evidence, the MPD acknowledges that "[t]he *admissibility* of evidence in a court of law will depend, in large part, on the manner in which the evidence was collected, and the precautions taken to ensure its integrity." METROPOLITAN POLICE DEPARTMENT, GENERAL ORDER NO. 304.08, COLLECTION OF PHYSICAL EVIDENCE; UTILIZATION OF THE CRIME SCENE EXAMINATION SECTION AND CRIME SCENE SEARCH OFFICERS at 4 (April 30, 1992), https://go.mpdconline.com/GO/GO_304_08.pdf (emphasis added) [hereinafter MPD GENERAL ORDER 304.08].

[6] Isolated sentences in this court's opinions in *Hammond v. United States*, 77 A.3d 964, 970 (D.C. 2013), *Garcia v. United States*, 897 A.2d 796, 801 (D.C. 2006), and *In re D.S.*, 747 A.2d 1182, 1187 (D.C. 2000), superficially support the government's argument because these sentences omit the critical qualifier, employed by the Supreme Court and endorsed by this court, that chain of custody deficiencies "normally" go to the weight of the proffered evidence. But far from exposing substantive conflict within our precedent, it appears this omission is attributable solely to inexact citation.

Indeed, for the proposition that a break in the chain of custody affects only weight not admissibility, *Hammond* and *Garcia* both cite to *In re D.S.*, which in turn cites to *Turney*. But *Turney* contains no limitation on the import of a break in the chain of custody; instead, as noted above, it approvingly cites cases where courts held that evidence was improperly admitted because the government failed to sufficiently prove an unbroken chain of custody. *See Turney*, 626 A.2d at 874-75. *Garcia* also cites to *Key v. United States*, 587 A.2d 1072 (D.C. 1991), which in

(continued…)

chain of custody could not affect admissibility, then the trial court should not have considered the chain of custody when deciding whether to admit the ballistics material. And this court presumably would have long ago eschewed appellate review of challenges to the admission of the government's evidence on this basis. That we have instead continued to entertain arguments for reversal based on the government's failure to prove an unbroken chain of custody (as we do in this case) refutes the government's argument.

Turning to the particular facts of this case, the government clearly failed to establish by a reasonable probability that it had maintained an unbroken chain of custody over the proffered ballistics material. To be sure, the government presented evidence that Mr. Turner collected cartridge cases and a live round of ammunition from the scene of the shooting. And it presented evidence that ballistics material was later examined and engraved by the firearms and toolmark examiner, Mr. Mulderig. But between those events there was an evidentiary void. This void precluded a determination by a reasonable probability that the

---

(…continued)
turn relies on *Bartley v. United States*, 530 A.2d 692 (D.C. 1987), and *Morrison v. United States*, 417 A.2d 409 (D.C. 1980). But neither case involved a challenge to the government's proof of chain of custody, and the cited passages in these two cases address only the sufficiency of the evidence regarding the operability of a weapon.

government maintained continuous custody and control of this ballistics material prior to trial and in fact suggests that the government lost track of it entirely for a period of time after its collection and before its examination.

Notably the trial court admitted the ballistics material after hearing relevant testimony from only Mr. Turner. But Mr. Turner did not provide information sufficient to support a determination by a reasonable probability that the government maintained continuous custody and control over these items.[7] He was able to provide information about the collection of the ballistics material at the scene of the shooting. But his knowledge of what happened to these items ended when his supervisor, Mr. Hammett, took possession of them. Moreover, Mr. Turner's testimony about the standard protocol for keeping track of objects collected from a crime scene simply put in relief the absence of any proof that such

---

[7] At least initially, the court recognized the deficiencies in Mr. Turner's testimony regarding chain of custody and twice denied premature motions from the government to admit ballistics material into evidence. The government made the first motion without having elicited any evidence about chain of custody from Mr. Turner—indeed, without eliciting any evidence that his crime-scene search team had taken possession of ballistics material at the scene. The government made the second motion having established only that ballistics material was collected by the crime-scene search team but having elicited no testimony from Mr. Turner about what the police did with this evidence. On both occasions, the court correctly observed that the government had to show that it had maintained continuous custody and control over the proffered evidence.

protocols were followed in this case.  In particular, Mr. Turner testified that crime scene materials should be "placed on a mobile crime property book" and indicated that information regarding the transfer of such materials from one department of MPD to another, e.g., from the mobile crime lab to the firearms examination section, should be reflected in that book.[8]  But he could not say that anyone in the MPD had recorded the collection and transfer of the cartridge cases and live round in this case, and the government did not offer the property log as an exhibit or present other evidence suggesting that the ballistics material was documented or tracked in this manner.

In ruling that the ballistics material was admissible after hearing Mr. Turner's testimony, the trial court determined it was sufficient that these items had, at some point, been "stored in a police property office," because "the presumption here" is that the office "preserve[s] the property."  But the trial court overlooked the government's failure to present any evidence explaining when the police

---

[8]  Mr. Turner's testimony that this evidence should have been documented is consistent with MPD GENERAL ORDER 304.08, *supra* note 6, which provides that the "crime scene examination section supervisor" is "responsible for . . . [m]aintaining an appropriate file documenting actions taken at all crime scenes," including "[a] complete inventory of all items taken as evidence" as well as "[t]he results of any examination made of such evidence." *Id.* at 13.

property office took possession of the ballistics material or how the material got there. *Cf. Gilmore v. United States*, 742 A.2d 862, 872 (D.C. 1999) (holding that the trial court did not abuse its discretion by rejecting a defendant's chain of custody challenge, despite an officer's "plainly careless" handling of an object recovered from the crime scene and his inability to locate the object for eight months, because the officer eventually found the object in his evidence locker and "was able to account for its whereabouts during the entire time period"). Effectively, the trial court gave the government the benefit of a double presumption: it presumed both that the government maintained continuous custody and control over the ballistics material and that it properly handled and preserved these items. By presuming too much, the trial court relieved the government of its burden of establishing the admissibility of the proffered evidence.

As a coda to the above analysis, it should be noted that the admission of the ballistics material was not contingent on the government's subsequent presentation of other chain-of-custody evidence. But even if it had been, none was forthcoming. To the contrary, the missing links in the government's chain of custody were revealed more starkly. Because the ballistics material was last seen in the possession of Mr. Hammett, the government needed to explain what Mr.

Hammett did with it. But to avoid a damaging cross-examination about Mr. Hammett's termination for mislabeling and mishandling evidence, the government opted not to forge the next link in the chain by calling Mr. Hammet to testify. Nor did the government present testimony from any witness who had obtained the ballistics material from Mr. Hammett. And again, the government did not present the property book or any other documentary evidence from which the journey of these objects could be traced.

Instead, the government presented the testimony of Mr. Mulderig, who testified that he examined some ballistics material in "[a]pproximately June of 2000." *See supra* note 19. Mr. Mulderig said nothing about where these items came from (because the government never asked him). The only certainty is that Mr. Mulderig did not get these items from Mr. Hammett. Mr. Mulderig's report notes that the cartridge cases and the live round of ammunition were "personally delivered" by "Technician Elizabeth Sharp-Hamlet" on the day after the shooting. But Ms. Sharp-Hamlet's role in the investigation is a complete unknown: she did not testify, no witness mentioned her, and her name is absent from every other document admitted at trial. Thus, there is no way to discern from this record who she was, where she obtained the ballistics material from, or whom she "personally delivered" it to.

In sum, whether one starts with Mr. Turner's collection of ballistics material and moves forward to Mr. Hammett, or whether one works backward from Mr. Mulderig's receipt of ballistics material from Ms. Sharp-Hamlet, one reaches a point where one cannot connect the dots—a point where one must conclude that the government's chain of custody was simply "insufficiently proved." *Turney*, 626 A.2d at 874. To provide sufficient proof, the government need not "call to the stand every witness who may have handled a piece of evidence," *Mejia*, 597 F.3d at 1336 n.4, but it must construct a foundation far stronger than the one in this case. Given the clear break in the chain of custody, the trial court abused its discretion by admitting the proffered ballistics material.[9]

_____

[9] As noted above, a break in the chain of custody does not require exclusion of physical evidence if the government can establish its genuineness and integrity by other means. *See supra* note 3; *see also, e.g., Mejia*, 597 F.3d at 1337 (D.C. Cir. 2010) (holding that the trial court did not abuse its discretion by admitting the government's proffered document, notwithstanding a break in the chain of custody, because the government offered "substantial corroborative evidence tying the [document] to Mejia," and "the brief (ten-minute) gap [in the chain of custody] ma[d]e[] implausible that it was planted, tampered with or misidentified.").

But the government did not carry that burden here. That Mr. Mulderig engraved the ballistics material might resolve questions about genuineness and integrity after that point, but it has no bearing on the break in the government's chain of custody evidence that preceded Mr. Mulderig's involvement. Mr. Turner's testimony purporting to identify the live bullet in Exhibit 1 is also insufficient to justify admission of all of the ballistics material proffered by the

(continued…)

government:  his testimony concerned only one of the government's forty-four exhibits.  Even as to Exhibit 1, Mr. Turner never explained how it was possible for him to identify a single, fungible bullet; he did not even testify as to its make or caliber.  Instead it appeared that he relied on its presence in the bag marked as Exhibit 1—a bag with a hole that Mr. Turner could not account for.